# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **MICHAEL E. BLAKE,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | |
| ) | |
| **BOEHRINGER INGELHEIM** ) | |
| **PHARMACEUTICALS, INC.,** ) | |
| ) | |
| **SANOFI-AVENTIS U.S. LLC,** ) | CIVIL ACTION NO. 4:20-cv-179 |
| ) | |
| **SANOFI US SERVICES INC.,** ) | |
| ) | |
| **CHATTEM, INC.** ) | |
| ) | |
| **PFIZER INC.,** ) | |
| ) | |
| **GLAXOSMITHKLINE PLC, and** ) | |
| ) | |
| **GLAXOSMITHKLINE LLC** ) | |
| ) | **JURY TRIAL DEMANDED** |
| *Defendants.* ) | |

## COMPLAINT

Plaintiff Michael E. Blake alleges the following upon information and belief, except for the allegations concerning his own experience, which are based on personal knowledge.

### INTRODUCTION

1.      Ranitidine, sold under the trade name of Zantac, is a histamine-2 ("H-2") blocker that decreases the amount of acid the stomach makes, and, in so doing, prevents and treats ulcers, gastroesophageal reflux disease ("GERD"), heartburn, and other conditions.

2.      When ingested and broken down during the digestion process, the molecular structure of the Zantac medication leads to the production of N-Nitrosodimethylamine ("NDMA") within the body.

3.      NDMA is "clearly carcinogenic."[1]  Not only that, but once present in the body NDMA can further metabolize into other known carcinogens like formaldehyde.

4.      Historically a chemical byproduct of rocket fuel, NDMA is now primarily used to generate tumors in rodents for laboratory experiments.

5.      The U.S. Food and Drug Administration ("FDA")'s allowable daily limit of NDMA is 96 nanograms.

6.      In one doze of Zantac, researchers are finding numbers of NDMA nanograms exceeding 3 million nanograms.

7.      The dangers of NDMA have been publicly known for over 40 years, well before Zantac was sold.[2]

8.      NDMA belongs to a family of chemicals called *N*-nitrosamines, which the U.S. Environmental Protection Agency refers to as "potent carcinogens."[3]

9.      That Zantac leads to the formation of NDMA was most recently confirmed in a series of scientific tests conducted by Valisure, LLC and ValisureRX, LLC (collectively "Valisure").[4]

---

[1] R.G. Liteplo, et al., *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, WORLD HEALTH ORGANIZATION (2002), *available at* https:www.who.int/ipcs/publications/cicad/en/cicad38.pdf.

[2] *See, e.g.,* Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979) ("As one of a family of carcinogens called nitrosamines, NDMA has caused cancer in nearly every laboratory animal tested so far.").

[3] *See* https://www.epa.gov/sites/production/files/2014-03/documents/ffrrofactsheet_contaminant_ndma_january2014_final.pdf (last visited Mar. 3, 2020).

[4] Valisure is an online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization.

10.    In those tests, Valisure "detected extremely high levels of NDMA in all lots [of ranitidine] tested, across multiple manufacturers of ranitidine products," including Zantac.[5]

11.    The tests conducted by Valisure show that "ranitidine can react with itself in standard analysis conditions . . . at high efficiency to produce NDMA at dangerous levels well in excess of the permissible daily intake limit for this probable carcinogen."[6]

12.    The FDA recently announced a permissible intake limit of 96 nanograms of NDMA per day,[7] though even this may be too high.

13.    A public health statement issued 30 years ago by the Agency for Toxic Substances and Disease Registry warned of the dangers posed by NDMA, noting among other things that "high level short-term and low level long-term exposure that caused non-cancerous liver damage and/or cancer in animals also usually resulted in internal bleeding and death."[8]

14.    Valisure's testing detected *2,511,469 nanograms* of NDMA per single 150 milligram tablet of Zantac.[9]  Put differently, using FDA-approved testing protocol, Valisure detected quantities of NDMA in each Zantac tablet that is more than *26,000 times* greater than the FDA's daily permissible NDMA intake levels.

---

[5] *See* Valisure Citizen Petition on Ranitidine ("Citizen Petition") at p. 6, *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf (last visited Mar. 3, 2020).

[6] *Id.* at p. 2.

[7] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (last visited Mar. 3, 2020).

[8] *See Toxicological Profile for N-Nitrosodimethylamine*, p. 14 (available at https://www.atsdr.cdc.gov/ToxProfiles/tp141.pdf) (last visited Mar. 3, 2020).

[9] Citizen Petition, at p. 6 fn. 7.

15.     Thus, a consumer who takes a 150 mg maintenance dose of Zantac once daily is exposed to 889,000,000 nanograms (0.889 grams) of NDMA annually—the FDA's permissible intake limit of NDMA is, again, 96 nanograms per day, or just 0.000034 grams annually.

16.     In addition to the FDA-recommended testing described above, when Valisure tested Zantac "in conditions simulating the human stomach," the quantity of NDMA detected was as high as 304,500 nanograms per tablet, *i.e.*, **_3,171 times_** more than the amount that may be ingested safely daily.[10]  This is consistent with recent peer-reviewed scientific literature, which has demonstrated the existence of dangerous levels of NDMA in the urine of those who have taken ranitidine.[11]

17.     In addition to testing Zantac for NDMA, Valisure also tested several other alternative drugs to Zantac, *e.g.*, Pepcid, Prilosec, Nexium, Prevacid, Protonix, AcipHex, and Dexilant, but did not detect any NDMA in any of these drugs. [12]

18.     When the news broke on September 13, 2019 that Zantac exposed users to NDMA "[g]lobal health regulators sounded a coordinated alarm."[13]

19.     Zantac has been recalled and pulled from the shelves throughout the United States and internationally.

20.     Defendants knew, or had reason to know, that Zantac exposes users to unsafe levels of the carcinogen NDMA.  During the period that Defendants manufactured and distributed Zantac, numerous scientific studies were published showing, among other things, that ranitidine (the

---

[10] *Id.*

[11] *See* Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[12] Citizen Petition, at pp. 15-16.

[13] Anna Edney & John Lauerman, *Carcinogen in Zantac and its generics triggers probes by FDA, EU*, THE HAMILTON SPECTATOR (Sept. 13, 2019), https://www.thespec.com/news-story/9595764-carcinogen-in-zantac-and-its-generics-triggers-probes-by-fda-eu/.

generic bioequivalent of Zantac) forms NDMA when placed in drinking water[14] and that a person who consumes ranitidine has a 400-fold increase of NDMA concentration in their urine.[15]

21.     Despite the weight of scientific evidence showing that Zantac exposed users to unsafe levels of the carcinogen NDMA, no Defendant ever disclosed this risk to the FDA, on the drug's label, or through any other means.

22.     Had Defendants disclosed that Zantac results in unsafe levels of NDMA in the human body, no person, let alone a reasonable person, would have consumed Zantac (or its generic equivalent).

## PARTIES

### Plaintiff Michael Blake

23.     Blake currently resides in Denton County, Texas.

24.     At the time he was taking Zantac and diagnosed with kidney cancer, Blake resided in Los Angeles County, California.

25.     After taking Zantac 150 (a 150 mg dose) almost daily since 2003 for GERD, Blake was diagnosed with kidney cancer in June 2015.  Because of the cancer, he underwent a nephrectomy of his right kidney in August 2015, requiring too at the same time the excision of

---

[14] *See, e.g.,* Massimiliano Sgroi, *et al.*, *N-Nitrosodimethylamine (NDMA) and its precursors in water and wastewater: A review of formation and removal*, 191 CHEMOSPHERE 685 (Oct. 15, 2017); Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVTL. SCI. & TECH. 8653 (June 26, 2014); Julien Le Roux, et al., *Chlorination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164 (Mar. 26, 2011); Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010); Giovanni Brambilla & Antonietta Martelli, *Update on genotoxicity and carcinogenicity testing of 472 marketed pharmaceuticals*, 681 MUTATION RESEARCH 209 (Sept. 19, 2008); Giovanni Brambilla & Antonietta Martelli, *Genotoxic and carcinogenic risk to humans of drug–nitrite interaction products*, 635 MUTATION RESEARCH 17 (Dec. 6, 2006).

[15] *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625, at fn. 20.

cancerous tissue that had adhered to the small intestine and the placement of a drainage tube to relieve the resultant internal bleeding.

26.    Because of the nephrectomy that the cancer necessitated, Blake has had less energy, interrupted sleep, and a change in diet.  More significantly, however, Blake has been unable to take certain medications because his sole remaining kidney is unable to process them and risk further kidney damage themselves.  These include medications for the treatment of his multiple sclerosis as well as for the relief of lingering injuries to his knees, shoulders, elbows, and other areas of his body from his time serving as a law enforcement officer in Los Angeles, California.

27.    Had he been warned that taking Zantac could lead to exposure to NDMA and, in turn, cancer, Blake would not have purchased nor taken Zantac.

**Defendants GlaxoSmithKline plc and GlaxoSmithKline LLC**

28.    GlaxoSmithKline plc is an English corporation with its principal place of business at 980 Great West Road in Brentford, Middlesex, England.   GlaxoSmithKline plc is the successor-in-interest to the companies that initially developed, patented, and commercialized the molecule known as ranitidine.   Ranitidine was initially developed by Allen & Hanburys Ltd.   Allen & Hanburys was acquired by Glaxo Labs Ltd. in 1958.   At the time ranitidine was discovered in the late 1970s, Allen & Hanburys was a subsidiary of Glaxo.

29.    Allen & Hanburys Ltd. was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule.   GlaxoSmithKline plc also conducted the clinical and other trials associated with Glaxo's New Drug Application (NDA 18703) submitted to the FDA for Zantac.

30.    In 1983, Glaxo Holdings, Ltd. was awarded approval by the U.S. FDA to sell Zantac in the United States.

31.    Defendant GlaxoSmithKline, LLC is a Delaware limited liability corporation with its principal place of business in Philadelphia, Pennsylvania.  Since 1983, GlaxoSmithKline LLC, either directly, or through a subsidiary, marketed prescription forms of Zantac in the United States.

32.    GlaxoSmithKline plc and GlaxoSmithKline, LLC (collectively "GlaxoSmithKline") from 1983 through 1996, had exclusivity with respect to Zantac and were the sole manufacturer and seller of prescription forms of Zantac.  Following 1996, GlaxoSmithKline also sold over-the-counter versions of Zantac and continued to sell the prescription version.

### Defendant Pfizer Inc. ("Pfizer")

33.    Pfizer is a Delaware corporation with a principal place of business at 235 East 42nd Street in New York, New York.

34.    From approximately 1996 through 1999, Pfizer's now subsidiary, Warner-Lambert Company, owned the rights to manufacture, market, and sell over-the-counter Zantac, and Warner-Lambert manufactured, marketed, and sold over-the- counter Zantac throughout the United States during that period.

35.    In or around 2000, Pfizer acquired Warner-Lambert, and Warner-Lambert merged into Pfizer.  From 2000 through approximately 2005, Pfizer possessed the rights to manufacture, market, and sell over-the-counter Zantac, and Pfizer manufactured, marketed and sold over-the-counter Zantac throughout the United States.

### Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer")

36.    Boehringer is a Delaware corporation with its principal place of business located at 900 Ridgebury Road in Ridgefield, Connecticut 06877.  Boehringer is a citizen of Connecticut and Delaware.

37.    Boehringer is a subsidiary of the German company Boehringer Ingelheim Corporation.

38.    Boehringer owned and controlled the Zantac new drug applications ("NDAs") for over-the-counter ("OTC") Zantac between December 2006 and January 2017, and manufactured and distributed the drug in the United States during that period.

**Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.**

39.    Sanofi US Services Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive in Bridgewater, New Jersey 08807.  Sanofi US Services Inc. is a citizen of Delaware and New Jersey.

40.    Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive in Bridgewater, New Jersey 08807.  Sanofi-Aventis U.S. LLC is a citizen of Delaware and New Jersey.

41.    Defendant Chattem, Inc. is a Tennessee corporation with a principal place of business at 1715 West 38th Street in Chattanooga, Tennessee 37409, and is a wholly owned subsidiary of the French company Sanofi.

42.    Defendants Sanofi-Aventis U.S., LLC; Sanofi US Services, Inc.; and Chattem, Inc. (collectively "Sanofi") controlled the U.S. rights to over-the- counter Zantac starting in January 2017 through the present and manufactured and distributed the drug in the United States during that period.

43.    Sanofi voluntarily recalled all brand name OTC Zantac on October 18, 2019.

## JURISDICTION AND VENUE

44.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because complete diversity exists between the parties.

45.     Personal jurisdiction is proper here inasmuch as Defendants have transacted business and/or committed a tort within the state of Texas.  Further, Defendants have purposely availed themselves of the benefits and protections of Texas by establishing sufficient minimum contacts with Texas such that the exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.  Defendants' contacts with Texas have been continuous and systematic and relate to this action.

46.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants may be deemed to reside in this District.

## BACKGROUND

47.     Zantac was developed in 1976 and approved for prescription use by the FDA in 1983.  Glaxo Holdings, Ltd. specifically developed the medication in response to the then leading H-2 blocker Tagamet (cimetidine).

48.     At the time that ranitidine was developed, there was scientific literature suggesting that drugs like Zantac, which contain a dimethylamine ("DMA") group within the molecule, are highly likely to form NDMA, when combined with other substances, i.e., nitrite, already found in the body. Indeed, nitrite is not only naturally found in the body, but bacteria and enzymes in the body, reduce the nitrates (NO3) found in food into nitrites (NO2-) and many foods and preservatives contain nitrates.  Glaxo scientists should have known that human physiology and diet would lead to the development of NDMA in the human body after ingestion of ranitidine.

49.     Due in large part to GSK's marketing strategy, Zantac was successful, reaching $1 billion in total sales in December 1986.  As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . .enabled the product to dominate the acid/peptic marketplace."[16]

50.     The marketing strategy that led to Zantac's success emphasized the purported safety of the drug.

51.     As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

52.     On September 13, 2019, in response to a citizen's petition filed by Valisure, Inc., U.S. and European regulators began reviewing the safety of the ranitidine in Zantac.

53.     On September 18, 2019, Novartis AG's Sandoz Unit, which makes generic drugs, stated that it was halting the distribution of its versions of Zantac in all markets, while Canada requested drug makers selling ranitidine to stop distribution.

54.     On September 28, 2019, CVS Health Corp. stated that it would stop selling Zantac and its own generic ranitidine products out of concern that it might contain a carcinogen.  Walmart, Inc., Walgreens Boot Alliance, and Rite Aid Corp. have also removed Zantac and ranitidine products.

55.     On October 2, 2019, the FDA stated that it was ordering all manufacturers of Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

---

[16] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MARKETING 4, 24 (Winter 1996).

56.     At no time did any Defendant attempt to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning.  Defendants had the ability to unilaterally add an NDMA and/or cancer warning to the Zantac label (for both prescription and OTC) without prior FDA approval pursuant to the Changes Being Effected regulation.  Had any Defendant attempted to add an NDMA warning to the Zantac label (either for prescription or OTC), the FDA would not have rejected it.

**Dangers of NDMA**

57.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes.  It is a member of N-nitrosamines, a family of potent carcinogens.  The dangers that NDMA poses to human health have long been recognized.  A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[17]

58.     NDMA is no longer produced or commercially used in the United States, except for research, such as a tumor initiator in certain animal bioassays.

59.     Both the Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.  And the World Health Organization ("WHO") has stated that scientific testing indicates that NDMA consumption is positively associated with either gastric or colorectal cancer and suggests that humans may be especially sensitive to the carcinogenicity of NDMA.

---

[17] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents*, 405 MUTAT. RESEAR. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

60. As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

61. Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.

62. The FDA has established a permissible daily intake limit of 96 nanograms of NDMA, but it detected NDMA levels as high as 20,190 nanograms per Valsartan tablet. In the case of Valsartan, the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only *some* products.

63. Zantac, however, poses a greater safety risk. Not only is NDMA a byproduct of the ranitidine molecule itself, *i.e.*, not a manufacturing defect, but the levels observed in recent testing exceed 3,000,000 nanograms of NDMA.

64. In studies examining the carcinogenicity of NDMA through oral administration, rats, mice, hamsters, and guinea pigs developed one or more cancers of the kidney, bladder, liver, lung, pancreas, and stomach.

65. In other studies, mice and rats developed cancer of the lung, liver, kidney, nasal cavity, and stomach when exposed to NDMA through inhalation or injection.

66. Zantac is in the FDA's category B for birth defects, meaning it is considered safe to take during pregnancy. However, in animal experiments, for those animals exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and kidneys.

67.    In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer.  In animal studies, derivatives of NDMA induced cancer in the stomach and intestine (including colon).

68.    Research shows that lower levels of NDMA, *i.e.*, 40 nanograms, are fully metabolized in the liver, but still enters the body's general circulation.

69.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

70.    Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested.

71.    Pursuant to the EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

72.    Moreover, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  And, while these studies consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction—as little as 1 millionth—of the exposures noted in a single Zantac capsule, *i.e.*, 0.191 nanograms/day (dietary) v. 304,500 nanograms/day (Zantac).

73.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day.[18]

---

[18] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995).

74.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[19]

75.    In another 1995 epidemiological case-control study looking at, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[20]

76.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[21]

77.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[22]

78.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[23]

---

[19] La Vecchia et al, *Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469– 474 (1995).

[20] Rogers et al, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cance*r, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995).

[21] Knekt et al, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999)

[22] Straif et al, *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).

[23] Loh et al, *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).

79.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[24]

### How Ranitidine Transforms into NDMA Within the Body

80.    The high levels of NDMA produced by Zantac are not caused by a manufacturing defect but are inherent to the molecular structure of ranitidine, the active ingredient in Zantac. The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA.  *See* Fig. 1.  Thus, ranitidine produces NDMA by "react[ing] with itself", which means that *every dosage and form of ranitidine*, including Zantac, exposes users to NDMA.

**Figure 1 –Ranitidine Structure & Formation of NDMA**



---

[24] Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR J NUTR. 6, 1109–1117 (2014).

81.    In 1981, the year Zantac was launched commercially outside of the US, two exchanges in The Lancet—one of the most widely read and respected medical and scientific publications—discussed the potential toxicity of cimetidine and ranitidine. Cimetidine, also an H2 blocker, has a similar chemical structure to ranitidine.

82.    Dr. Silvio de Flora, an Italian researcher from the University of Genoa, wrote about experiments he had conducted looking at cimetidine and ranitidine in human gastric fluid. When ranitidine was exposed to gastric fluid in combination of with nitrites, his experiment showed "toxic and mutagenic effects[.]"[25]

83.    Dr. de Flora hypothesized that these effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions." Concerned with these results, Dr. de Flora cautioned that, in the context of rantidine ingestion, "it would seem prudent to avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals, or by giving inhibitors of nitrosation such as ascorbid acid."

84.    GSK responded.[26]  A group of GSK researchers specifically noted they "were obviously concerned as to whether or not a mutagenic N-nitroso derivative of ranitidine could be formed in the stomach."

85.    In other words, GSK was fully aware of the potential NDMA issue.

86.    GSK acknowledged that ranitidine in the presence of nitrites formed a "N-nitroso nitrolic acid derivative" that was "mutagenic[.]"  GSK, however, dismissed this finding because the levels of nitrate used were much higher than what would be expected to occur after a meal and,

---

[25] De Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, THE LANCET 993-994 (Oct. 31, 1981).

[26] Brittain et al, *The Safety of Ranitidine*, THE LANCET 1119 (Nov. 14, 1981).

therefore, any N-Nitroso compound found would not likely occur in human in real world experiences.  GSK asserted that "no mutagenic nitrosated product of ranitidine is likely to be formed in man under any conceivable physiological conditions[.]"

87.    In 1983, the same year Zantac was approved in the U.S., seven researchers from the University of Genoa published a study discussing the nitrosation of ranitidine and its genotoxic effects (ability to harm DNA).[27]   The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells. … These findings are consistent with those of De Flora, who showed that preincubation of ranitidine with excess nitrite in human gastric juice resulted in mutagenic effects[.]"

88.    Then, again in 1983, Dr. de Flora, along with four other researchers, published the complete findings.[28]  The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine[.]"

89.    Again, the authors noted that, " the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals … Ascorbic acid has been proposed as an inhibitor of nitrosation combined with nitrosatable drugs and appears to block efficiently the formation of mutagenic derivatives from . . . ranitidine."

90.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the

---

[27] Maura et al, *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 TOX. LTTRS. 97-102 (1983)

[28] De Flora et al, *Genotoxicity of nitrosated ranitidine*, 4 CARCINOGENESIS 3, 255-260 (1983).

breakdown of ranitidine were proposed, as shown in Figure 2 above.[29]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

91.     These studies did not appreciate the full extent of NDMA formation risk from ranitidine; however.  Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

92.     Valisure is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the ISO, an accreditation recognizing the laboratories' technical competence.

93.     Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market.

94.      In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

95.     As part of its testing of Zantac, and other ranitidine products, Valisure discovered, in every lot tested, exceedingly high levels of NDMA.  Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8.  As per the FDA protocol, this method was validated to a lower limit of detection of 25 nanograms.[30]

96.     The results of Valisure's testing show levels of NDMA well above 2 million nanograms per 150 mg Zantac tablet.

---

[29] Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 *Environ. Sci. Technol.* 20, 11095-11103 (2012).

[30] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S.*

97.     Valisure's testing shows, on average, 2,692,291 nanograms of NDMA in a 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 nanograms, this would put the level of NDMA at *28,000 times* that of the FDA's determined limit.

98.     Valisure, however, was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol.  So, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

99.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" and "Simulated Intestinal Fluid" were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

100.     Zantac, of course, was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, etc.[31]

101.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present.

102.     Under biologically relevant conditions, when nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit.

103.     Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite.  This fact is well known and even

---

[31] *See, e.g.*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug. Thus, higher levels of nitrites in patients regularly taking Zantac would be expected.

104. In fact, NDMA formation in the stomach has been a concern for many years and specifically ranitidine has been implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.

105. Existing research shows that ranitidine interacts with nitrites and acids in the chemical environment of the human stomach to form NDMA. In *vitro tests* demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso derivatives) by interacting with gastric fluids in the human stomach, the by-product created is dimethylamine ("DMA") – which is an amine present in ranitidine itself. When DMA is released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

106. Moreover, in addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH") which can occur in other tissues and organs separate from the stomach.

107. Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder.

108. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a

useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[32]

109.    In Figure 3, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).

**Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**



110.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

111.    Figure 4 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.

---

[32] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 *J. BIO. CHEM.* 17, 10205-10209 (1989).

**Figure 3 – Expression levels of DDAH-1 enzyme by Organ**



112.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate.

113.    This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

114.    In addition to the aforementioned *in vitro* studies that suggest a strong connection between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further weight to concern over this action and overall potential carcinogenicity.

115.    A study published in the journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in combination with nitrite. The authors of this study concluded: "Our experimental findings have shown that simultaneous oral administration in rats of high doses

of ranitidine and NaNO2 [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[33]

116.    The human data, although limited at this point, is even more concerning.  A study completed and published in 2016 by Stanford University observed that healthy individuals, both male and female, who ingested Zantac 150 mg tablets produced roughly 400 times elevated amounts of NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[34]

117.    Likely due to the perceived high safety profile of ranitidine, very few epidemiological studies have been conducted on this drug.

118.    A 2004 study published by the National Cancer Institute investigated 414 cases of peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[35]  One of the variables investigated by the authors was the patients' consumption of a prescription antacid, either Tagamet (cimetidine) or Zantac (ranitidine).  The authors concluded that "[r]ecent use of ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this association was independent of the elevated risk observed with gastric ulcers."

119.    Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk." NDMA is among the most common of the N- Nitrosamines.

120.    A 1982 clinical study in rats compared ranitidine and cimetidine exposure in combination with nitrite.  When investigating DNA fragmentation in the rats' livers, no effect was

---

[33] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, 4 CARCINOGENESIS 10, 1281-1285 (1983).

[34] Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016)

[35] Michaud et al, *Peptic ulcer disease and the risk of bladder cancer in a prospective study of male health professionals*, 13 CANCER EPIDEMIOL BIOMARKERS PREV. 2, 250-254 (2004).

observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[36]

121.    Investigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of these findings. Regarding ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine is concerning, particularly considering the widespread use of this medication. Given the known carcinogenic potential of NDMA, this finding may have significant public health implications[.]"

### Defendants Knew of the NDMA Defect but Failed to Warn or Test

122.    During the time that Defendants manufactured and sold Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA.

123.    Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

124.    Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.  This was known or should have been known by Defendants.

125.    Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

---

[36] Brambilla et al, *Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance*, 52 CHEMICAL CARCINOGENESIS (1982).

126.    Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

127.    "The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product." 21 C.F.R. § 314.81(b)(2)(v).

128.    Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

129.    Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

130.    In a 1981 study published by GSK, the originator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[37]  Many metabolites were listed, though there is no indication that NDMA was looked for.  It is possible this was intentional, a gambit by the manufacturer to avoid detecting a carcinogen in their product.

---

[37] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL. 1, 161-168 (1981).

131.    By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[38]    This study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one).

132.    However, the study was rigged to fail.  It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines.

133.    Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."  So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed.

134.    Again, it is believed that this spurious test was intentional and designed to mask any potential cancer risk.

135.    In fact, on information and belief, none of the Defendants ever used a mass spectromfetry assay to test for the presence of nitrosamines in any of the studies and trials they did in connection with its trials associated with the ranitidine NDA.  That is because when using mass spectrometry, it requires heating of up to 130 degrees Celsius, which can result in excessive amounts of nitrosamines being formed.  Had Defendants used a mass spectrometry assay, it would

---

[38] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 *GUT*. Vol. 28, 726-738 (1987).

have revealed in the finding of large amounts of NDMA, and the FDA would never have approved Zantac as being safe.

136.    There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and Lansoprazole (Prevacid).

### Exemplary / Punitive Damages Allegations

137.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of Zantac, particularly the carcinogenic potential of Zantac as it transforms into NDMA within the chemical environment of the human body.

138.    Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers.

139.    This was not done by accident or through some justifiable negligence.  Rather, Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to humans, and that full disclosure of the true risks of Zantac would limit the revenue generated from Zantac.

140.    Defendants' object was accomplished not only through its misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.

141.    Blake was denied the right and opportunity to make an informed decision about whether to purchase and use Zantac.  Defendants withheld, masked, and otherwise obfuscated the relevant information with a conscious disregard of Blake's rights.

142.    Accordingly, Blake requests that punitive damages be awarded against Defendants for the harms caused.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

### Discovery-Rule Tolling

143.    Within the period of any applicable statutes of limitation, Blake could not have discovered through the exercise of reasonable diligence that high levels of the carcinogen NDMA was produced by Zantac ingestion.

144.    Blake did not discover, and did not know of, facts that would have caused a reasonable person to suspect that their injuries were caused by Defendants' concealment of the fact that high levels of the carcinogen NDMA were produced by Zantac.  The information linking Zantac to NDMA was contained exclusively in articles that were published in scientific journals. Blake did not have access to these scientific articles.

145.    Even had the articles been available, the significance of these highly technical articles would not have been apparent to Blake.

146.    Blake could not have reasonably discovered the true extent of Defendants' deception about Zantac's safety until the FDA issued it's notice or until the drug was recalled.

147.    For these reasons, the applicable statutes of limitation have been tolled by operation of the discovery rule.

### Fraudulent-Concealment Tolling

148.    The applicable statutes of limitation have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's producing high levels of the carcinogen NDMA.

149.    Instead of disclosing to consumers the link between Zantac and the carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this information on the drug's label or elsewhere.    Further, Defendants misled the public into believing Zantac was safe by repeatedly touting the safety of Zantac.  Indeed, until the day it issued its recall, Defendant Sanofi still claimed that "longstanding science supports the safety of Zantac."

## Estoppel

150.    Defendants were under a continuous duty to disclose to Blake the risk of NDMA exposure associated with Zantac.

151.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Zantac and never updated the drug's label to disclose this risk.

152.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## Continuing Tort

153.    The continuing tort doctrine applies when there is a repeated or continuous injury and the tort is not completed until the last injury is inflicted or the wrongdoing ceases.  In cases of continuing torts, the statutes of limitations do not begin to run until the date of the last tortious act.

## CAUSES OF ACTION[39]

### Count One
### Products Liability—Design Defect

154.    Blake incorporates by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

155.    Blake brings this action against Defendants for defective design.

156.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are defective and unreasonably dangerous to consumers, including Blake, thereby placing Zantac products into the stream of commerce.   These actions were under the ultimate control and supervision of Defendants.

157.    At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Zantac products used by Blake, as described herein.

158.    At all relevant times, Defendants' Zantac products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Blake.

159.    At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Blake, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

---

[39] Blake pleads these causes of action under both California and Texas common law unless otherwise specified, anticipating a future determination on choice of law.

160.    At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac products within this judicial district and aimed at a consumer market within this judicial district.  Defendants were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in this judicial district.

161.    Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

162.    Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

163.    At all relevant times, Defendants knew or had reason to know that Zantac products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

164.    Therefore, at all relevant times, Defendants' Zantac products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

   a.  When placed in the stream of commerce, Defendants' Zantac products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Zantac products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Zantac products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Zantac products and, specifically, the ability for Zantac to transform into the carcinogenic compound NDMA within the human body;

e. Exposure to Zantac products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

f. Defendants knew or should have known at the time of marketing Zantac products that exposure to Zantac could result in cancer and other severe illnesses and injuries;

g. Defendants did not conduct adequate post-marketing surveillance of its Zantac products; and

h. Defendants could have employed safer alternative designs and formulations.

165.   Blake used and was exposed to Defendants' Zantac products without knowledge of Zantac's dangerous characteristics.

166.   At all times relevant to this litigation, Blake used and/or was exposed to the use of Defendants' Zantac products in an intended or reasonably foreseeable manner without knowledge of Zantac's dangerous characteristics.

167.   Blake could not reasonably have discovered the defects and risks associated with Zantac products before or at the time of exposure due to Defendants' suppression or obfuscation of scientific information linking Zantac to cancer.

168.   The harm caused by Defendants' Zantac products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Zantac products were and are more dangerous than alternative

products, and Defendants could have designed Zantac products to make them less dangerous. Indeed, at the time Defendants designed Zantac products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

169.    At the time Zantac products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Zantac products. For example, Defendants could have added ascorbic acid (Vitamin C) to each dose of Zantac, which is known to scavenge nitrites and reduce the ability of the body to recombine ranitidine into NDMA.[40]

170.    Defendants' defective design of Zantac products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Zantac products, including Blake.

171.    Therefore, as a result of the unreasonably dangerous condition of their Zantac products, Defendants are strictly liable to Blake.

172.    The defects in Defendants' Zantac products were substantial and contributing factors in causing Blake's injuries, and, but for Defendants' misconduct and omissions, Blake would not have sustained injuries.

173.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Blake, with knowledge of the safety problems

---

[40] *See, e.g.*, Vermeer, et al., *Effect of ascorbic acid and green tea on endogenous formation of N nitrosodimethylamine and N-nitrosopiperidine in humans*. 428 MUTAT. RES., FUNDAM. MOL. MECH. MUTAGEN. 353–361 (1999); Garland et al., *Urinary excretion of nitrosodimethylamine and nitrosoproline in humans: Interindividual and intraindividual differences and the effect of administered ascorbic acid and α-tocopherol*, 46 CANCER RESEARCH 5392–5400 (1986).

associated with Zantac products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.

174.    Defendants' reckless conduct warrants an award of punitive damages.

175.    As a direct and proximate result of Defendants placing its defective Zantac products into the stream of commerce, and the resulting injuries, Blake sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

176.    As a proximate result of Defendants placing its defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Blake has suffered great mental anguish and other personal injury and damages.

177.    As a proximate result of Defendants placing its defective Zantac products into the stream of commerce, as alleged herein, Blake sustained loss of income and/or loss of earning capacity.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## Count Two
## Products Liability—Failure to Warn

178.    Blake incorporates by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

179.    Blake brings this action against Defendants for failure to warn.

180.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products which are defective and unreasonably dangerous to consumers, including Blake, because they do not

contain adequate warnings or instructions concerning the dangerous characteristics of Zantac and NDMA.

181.    These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Zantac and other ranitidine formulations within this judicial district and aimed at a consumer market. Defendants were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in in this judicial district.

182.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Zantac products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Blake, and therefore had a duty to warn of the risks associated with the use of Zantac products.

183.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Zantac products did not cause users and consumers to suffer from unreasonable and dangerous risks.

184.    Defendants had a continuing duty to warn Blake of dangers associated with Zantac.

185.    Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

186.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Zantac products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

187.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Zantac products, including Blake.

188.    Even though Defendants knew or should have known that Zantac posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.

189.    The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Zantac, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Blake.

190.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products.

191.    Defendants have wrongfully concealed information concerning the dangerous nature of Zantac and the potential for ingested Zantac to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of Zantac products.

192.    At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Blake, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

193.    Blake was exposed to Defendants' Zantac products without knowledge of their dangerous characteristics.

194.    At all relevant times, Blake used and/or was exposed to the use of Defendants' Zantac products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

195.    Blake could not have reasonably discovered the defects and risks associated with Zantac products prior to or at the time of Blake consuming Zantac.

196.    Blake relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

197.    Defendants knew or should have known that the minimal warnings disseminated with their Zantac products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

198.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Blake to utilize the products safely and with adequate protection.

199.    Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Zantac; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac.

200.    This alleged failure to warn is not limited to the information contained on Zantac's labeling.

201.    Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Zantac through other non- labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources.  But Defendants did not disclose these known risks through any medium.

202.    Defendants are liable to Blake for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of Zantac.

203.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Zantac products, Blake could have avoided the risk of developing injuries and could have obtained or used alternative medication.

204.    As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Blake was injured and has sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

205.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Blake suffered great mental anguish and other personal injury and damages.

206.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, Blake sustained loss of income and/or loss of earning capacity.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### Count Three
### Negligence

207.    Blake incorporates by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

208.    Defendants, directly or indirectly, caused Zantac products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Blake.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac within this judicial district and aimed at a consumer market within this district.

209.    At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Zantac products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

210.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Zantac products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Zantac and appropriate, complete, and accurate warnings concerning

the potential adverse effects of Zantac and, in particular, its ability to transform into the carcinogenic compound NDMA.

211.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Zantac and, specifically, the carcinogenic properties of NDMA when Zantac is ingested.

212.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of Zantac products could cause or be associated with Blake's injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Blake.

213.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Zantac were unaware of the risks and the magnitude of the risks associated with use of Zantac.

214.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac products, in that Defendants manufactured and produced defective Zantac which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.

215.    Indeed, Defendants deliberately refused to test Zantac products because they knew that the chemical posed serious health risks to humans.

216.    Defendants were negligent in their promotion of Zantac, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac, including, *e.g.*, the internet, television, and print advertisements.

217.    Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Zantac in their promotional efforts, outside of the context of labeling.

218.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so.

219.    Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of Zantac.

220.    Defendants' negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and the carcinogenic potential of NDMA as created in the human body as a result of ingesting Zantac, and, consequently, the risk of serious harm associated with human use of Zantac;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zantac products were safe for their intended consumer use;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Zantac products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e.  Failing to design and manufacture Zantac products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac products;

g. Failing to disclose to Blake, users/consumers, and the general public that use of Zantac presented severe risks of cancer and other grave illnesses;

h. Failing to warn Blake, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Blake and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac products;

j. Representing that their Zantac products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Zantac products' labeling or other promotional materials that would alert consumers and the general public of the risks of Zantac;

l. Advertising, marketing, and recommending the use of the Zantac products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Zantac;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Zantac products are not unsafe for regular consumer use; and

n. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

221.   Defendants knew and/or should have known that it was foreseeable consumers such as Blake would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Zantac.

222.   Blake did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Zantac.

223.   Defendants' negligence was the proximate cause of Blake's injuries, *i.e.*, absent Defendants' negligence, Blake would not have developed cancer.

224.    Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Blake, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re- label, warn, or inform the unsuspecting public, including Blake.

225.    Defendants' reckless conduct therefore warrants an award of punitive damages.

226.    As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Blake was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

227.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Blake suffered great mental anguish and other personal injury and damages.

228.    As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, Blake sustained a loss of income, and loss of earning capacity.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## Count Four
## Breach of Express Warranties

229.    Blake incorporates by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

230.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are defective and unreasonably dangerous to consumers, including Blake, thereby placing Zantac

products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

231.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Zantac products, including a duty to:

    a.    ensure that its products did not cause the user unreasonably dangerous side effects;

    b.    warn of dangerous and potentially fatal side effects; and

    c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Zantac, when making representations to consumers and the general public, including Blake.

232.    As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with Zantac is not limited to representations made on the labeling.

233.    At all relevant times, Defendants expressly represented and warranted to the purchasers of its products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Zantac products were safe to human health and the environment, effective, fit, and proper for their intended use.

234.    Defendants advertised, labeled, marketed, and promoted Zantac products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Zantac products would conform to the representations.

235.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Zantac.

236.    Defendants knew and/or should have known that the risks expressly included in Zantac warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that Zantac products were safe and effective, that they were safe and effective for use by individuals such as Blake, and/or that they were safe and effective as consumer medication.

237.    The representations about Zantac, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

238.    Defendants placed Zantac products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of Zantac.

239.    Defendants breached these warranties because, among other things, Zantac products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

    a.  Defendants represented through its labeling, advertising, and marketing materials that Zantac products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of Zantac and by expressly limiting the risks associated with use within its warnings and labels; and

    b.  Defendants represented that Zantac products were safe for use and intentionally concealed information that demonstrated that Zantac, by transforming into NDMA upon human ingestion, had carcinogenic properties, and that Zantac products, therefore, were not safer than alternatives available on the market.

240.    Blake detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of Zantac in deciding to purchase the product.

241.    Blake reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Zantac.

242.    Blake would not have purchased or used Zantac had Defendants properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

243.    Defendants had sole access to material facts concerning the nature of the risks associated with its Zantac products, as expressly stated within their warnings and labels, and knew that consumers and users such as Blake could not have reasonably discovered that the risks expressly included in Zantac warnings and labels were inadequate and inaccurate.

244.    Blake had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Zantac.

245.    Blake used and/or was exposed to Zantac as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

246.    Had the warnings, labels, advertisements, or promotional material for Zantac products accurately and adequately set forth the true risks associated with the use of such products, including Blake's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Blake could have avoided the injuries complained of herein.

247.    As a direct and proximate result of Defendants' breach of express warranty, Blake has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

248.    As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Blake suffered great mental anguish and other personal injury and damages.

249.    As a proximate result of Defendants' breach of express warranty, as alleged herein, Blake sustained a loss of income and/or loss of earning capacity.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

**Count Five**
**Breach of Implied Warranties**

250.    Blake incorporates by reference every allegation set forth in the preceding paragraphs as if fully stated herein.

251.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which were and are defective and unreasonably dangerous to consumers, including Blake, thereby placing Zantac products into the stream of commerce.

252.    Before Blake used Zantac products, Defendants impliedly warranted to its consumers, including Blake, that Zantac products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

253.    But Defendants failed to disclose that Zantac has dangerous propensities when used as intended and that use of Zantac products carries an increased risk of developing severe injuries, including Blake's injuries.

254.    Blake was an intended beneficiary of the implied warranties made by Defendants to purchasers of its Zantac products.

255.    The Zantac products were expected to reach and did in fact reach consumers and users, including Blake, without substantial change in the condition in which they were manufactured and sold by Defendants.

256.    At all relevant times, Defendants were aware that consumers and users of its products, including Blake, would use Zantac products as marketed by Defendants, which is to say that Blake was a foreseeable user of Zantac.

257.    Defendants intended that Zantac products be used in the manner in which Blake, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Zantac was not adequately tested or researched.

258.    In reliance upon Defendants' implied warranty, Blake used Zantac as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

259.    Blake could not have reasonably discovered or known of the risks of serious injury associated with Zantac.

260.    Defendants breached their implied warranty to Blake in that Zantac products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.

261.    Zantac has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

262.    The harm caused by Defendants' Zantac products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

263.    As a direct and proximate result of Defendants' breach of implied warranty, Blake has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

264.    As a proximate result of Defendants' breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Blake suffered great mental anguish and other personal injury and damages.

265.    As a proximate result of Defendants' breach of implied warranty, as alleged herein, Blake sustained a loss of income and/or loss of earning capacity.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### Count Six
### Battery

266.    Blake incorporates by reference every allegation set forth in the preceding paragraphs as if fully stated herein.

267.    Since Glaxo invented ranitidine, and as fully set forth above, each Defendant knew that when ingested, Zantac metabolizes and forms high levels of NDMA in the body.   During the period of time each Defendant sold Zantac, it knew Zantac formed excessive levels of NDMA in the body.

268.    Decades before Zantac was first commercially sold in the United States in 1983, Glaxo knew that NDMA was carcinogenic. Each Defendant also knew at the time they sold Zantac

that NDMA was a potent carcinogen.

269.    At the time each Defendant manufactured and sold Zantac, it manufactured and sold Zantac for the express purpose of being used by unwitting consumers, who didn't know that when ingested, Zantac formed excessive levels of NDMA in the body.   Therefore, at all relevant times, Defendants knew that was certain or substantially certain that Blake would be subjected to excessive levels of NDMA upon ingestion of Zantac, which they manufactured and sold.

270.    Blake ingested Zantac, and, as a result, was exposed to excessive amounts of NDMA.

271.    Blake's exposure to NDMA was caused directly by Defendants.

272.    No reasonable person would want to be subjected to excessive levels of a potent carcinogen, and thus, Blake's exposure to NDMA constituted an offensive contact caused by Defendants.

273.    Although Blake voluntarily ingested Zantac, at no time did Blake know that Zantac ingestion resulted in the formation of excessive levels of NDMA in the body.

274.    If Blake had known this, he would not have taken Zantac. Blake never consented, implicitly or explicitly, to ingesting a substance that would lead to the formation of large amounts of NDMA.

275.    Defendants' battery upon Blake proximately caused his injuries and damages for which recovery is sought.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

**Count Seven**
**Fraud by Omission**

276.    Blake incorporates by reference every allegation set forth in the preceding paragraphs as if fully stated herein.

277.    At all times, Defendants had a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including Zantac.

278.    Defendants have a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that their pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

279.    Defendants had a duty to monitor the adverse effects associated with pharmaceutical products, including Zantac.

280.    Defendants have a duty to exercise reasonable care when they undertake affirmative acts for the protection of others.

281.    Defendants owe these duties to Blake because it was foreseeable to Defendants that patients like Blake would ingest and consequently be endangered by Zantac.

282.    Defendants also owed a duty to speak because they were in possession of information about Zantac that was not readily available to Blake and Blake's physicians, made misrepresentations about the safety of Zantac to Blake and Blake's physicians while suppressing material facts, and actively concealed material information about Zantac from Blake and Blake's physicians, including that when ingested, Zantac formed high levels of NDMA and other dangerous and carcinogenic metabolites in the human body.

283.    Defendants knew that this information was not readily available, and Blake and his doctors did not have an equal opportunity to discover the truth.  Blake and his doctors had no practicable way of discovering the true state and timing of Defendants' knowledge.

284.    Defendants intentionally omitted from their prescriber and patient labeling any type of warning alerting patients and their physicians that when ingested, Zantac forms high levels of NDMA and other harmful metabolites in the body.

285.    And, given that Defendants advertised and promoted Zantac as being safe, Defendants had a duty to speak and reveal the fact that they knew when ingested, Zantac formed NDMA and other harmful metabolites in the body.

286.    Blake and his doctors justifiably relied on Defendants' product labeling and other representations.

287.    Had Defendants not omitted this information about the safe use of their drugs from the prescriber and patient labeling, doctors would not have prescribed (or recommended), and patients would not have taken Zantac. But for Defendants' omissions, Blake would not have consumed Zantac.

288.    If Blake had been properly warned about the dangers of Zantac use, he would not have taken Zantac, and would not have developed his injuries, or been at risk for developing cancer from Zantac usage.

289.    Blake and his doctors justifiably relied on Defendants' omissions regarding Zantac.

290.    Had Blake disclosed that they were aware of, but intentionally withheld, that Zantac forms NDMA and other harmful metabolites in the body once ingested, Blake would not have ingested Zantac.

291.    Blake was injured as a direct and proximate result of Defendants' material omissions.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### Count Eight
### Violation of the Texas Product Liability Act, Tex. Civ. Prac. & Rem. § 82.001, *et seq.*

292.    Blake incorporates by reference every allegation set forth in the preceding paragraphs as if fully stated herein.

293.    Defendants sold or otherwise put Zantac products into the stream of commerce in a defective condition unreasonably dangerous to ordinary users like Blake incorporates by reference every allegation set forth in the preceding paragraphs as if fully stated herein.

294.    Zantac was expected to, and did, reach users like Blake without substantial alteration in the condition in which Defendants manufactured and sold it.

295.    Defendants are "manufacturers" as that term is used in Tex. Civ. Prac. & Rem. § 82.001.

296.    Zantac is defective in design and Defendant failed to adequately warn about the dangers and proper use of Zantac.

297.    A safer alternative design for Zantac exists.

298.    Using the safer alternative design would have prevented or significantly reduced the risk of Blake's injuries without substantially impairing the product's utility.

299.    The safer alternative design was economically and technologically feasible at the time the product left the control of the manufacturer by the application of existing or reasonably achievable scientific knowledge.

300.    At the time Zantac left Defendants' control, Zantac was in a defective condition not contemplated by reasonable persons among those considered expected users or consumers of the

products and that will be unreasonably dangerous to the expected, ultimate user or consumer when used in reasonably expected ways of handling or consumption.

301.    Zantac is dangerous to an extent beyond which would be contemplated by the ordinary user and consumer, with ordinary knowledge common to the community as to the product's characteristics.

302.    Zantac is defective because the Defendant failed to properly and adequately label Zantac to give reasonable warnings of the danger about Zantac.  If such warnings were provided, the harm would have been avoided.

303.    Further, all of the Zantac products described herein are defective in their design, formula, preparation, testing, warnings, instructions, marketing, packaging, and labeling.

304.    The defective condition of Zantac rendered it unreasonably dangerous to ultimate users like Blake.

305.    Defendants misrepresented the safety of Zantac.

306.    Further, Defendants breached implied and express warranties by placing Zantac into the stream of commerce, knowing it was defective in its design, formulation, standards, preparation, testing, warning, instruction, marketing, advertising, and labeling.

307.    Blake is in the class of persons who are ordinary consumers who purchased Zantac, with the ordinary knowledge common to the community about the products' characteristics.

308.    Zantac was not known to be unsafe by the ordinary consumer with ordinary knowledge common to the community.

309.    Defendants failed to exercise reasonable care under the circumstances in designing Zantac and in providing warnings or instructions regarding the dangerous propensities of Zantac.

310.    At the time Zantac left Defendants' control, the risks of users like Blake developing

injuries from Zantac use were known or reasonably foreseeable to Defendants.

311.    At the time Zantac left the Defendant's control, the inherent, foreseeable and known risks associated with the design exceeded the benefits of the design.

312.    Zantac did not comply with the state of technical, scientific, or medical knowledge generally prevailing at the time the product left control of the manufacturer.

313.    Blake exercised reasonable care in the use of Zantac.

314.    The defective and unreasonably dangerous condition of Zantac proximately caused Blake's physical injuries for which recovery is sought.

315.    Defendants acted with reckless disregard for the rights and safety of Blake and acted with intentional and wanton violation of those rights. Blake seeks punitive damages for injuries caused by Defendant's wanton and malicious conduct.

WHEREFORE, Blake respectfully requests this Court to enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Blake demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Blake requests the Court to enter judgment in his favor and against Defendants for:

a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b. exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

    c.  pre-judgment and post-judgment interest;

    d.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    e.  any other relief the Court may deem just and proper.

Dated:  March 5, 2020        Respectfully submitted,

**ERSKINE & McMAHON, L.L.P.**

 /s/  *Chad F. Newman*          
Chad F. Newman
Texas Bar No. 24067796
chadn@erskine-mcmahon.com
P.O. Box 3485
Longview, TX 75606
(903) 757-8435
(903) 757-9429 (fax)


**SCHLICHTER, BOGARD & DENTON, LLP**

Kristine K. Kraft (*pro hac vice application to be filed*)
kkraft@uselaws.com
Scott H. Morgan (*pro hac vice application to be filed*)
smorgan@uselaws.com
100 South 4th Street, Suite 1200
St. Louis, Missouri 63012
(314) 621-6115
(314) 621-6151 (fax)


***ATTORNEYS FOR PLAINTIFF***